# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JEROME ARRINGTON** | : | CIVIL ACTION NO. 1:05-CV-0245 |
| **Plaintiff** | : | (Judge Conner) |
| v. | : | |
| **D. INCH, LT., et al.,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Presently before the court is defendants' motion to dismiss plaintiff Jerome Arrington's ("Arrington") complaint, or in the alternative, for summary judgment. (Doc. 17). For the reasons that follow, the motion for summary judgment will be granted.

**I.    Statement of Facts**

Arrington, a federal inmate, confined at the United States Penitentiary at Allenwood (USP-Allenwood), White Deer, Pennsylvania brings both a Bivens[1] action pursuant to 28 U.S.C. § 1331, and a Federal Tort Claims Act ("FTCA") pursuant to 28 U.S.C. § 2671, *et seq*. Named as defendants in the Bivens action are Health Services Administrator Ronald A. Laino ("Laino"), and Physician's Assistant Diane Inch ("Inch"). Laino has held the position of Health Services Administrator

---

[1] Bivens v. Six Unknown Named Agents of the Fed. Bur. Of Narcotics, 403 U.S. 388 (1971). Bivens stands for the proposition that "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal question jurisdiction of the district court to obtain an award of monetary damages against the responsible federal official." Butz v. Economou, 438 U.S. 478 (1978).

for the Federal Correctional Complex at Allenwood, Pennsylvania since April 1993. (Doc. 25-1, p. 3, ¶ 1). In October 2000, Inch joined the Public Health Service and holds the rank of lieutenant commander. (Doc. 24-2, p. 44. Appropriately, the United States has been substituted as the defendant in the FTCA matter.

Arrington arrived at USP-Allenwood in May 2001. Based on a history of asthma, he qualified for quarterly evaluations at the pulmonary and infectious disease clinic. (Doc. 25-1, pp. 4-5). In April 2002, he was evaluated in the clinic and informed that he had tested positive for Hepatitis C. He was also advised about the nature and consequences of the disease as well as treatment alternatives. (Doc. 25-1, p. 45). Arrington indicated that he wanted the Hepatitis C managed "conservatively." (Id.).

On August 23, 2002[2], Arrington was seen by Physician's Assistant ("P.A.") Inch for complaints of nausea and a temperature. He was instructed to increase his fluids, eat more sensibly and to get antacid tablets from the pill line, if necessary. (Doc. 25-1, p. 49). He was also advised to return to sick call if his symptoms persisted.

Arrington returned on September 13, 2002, complaining that he had been suffering from nausea and an upset stomach for two weeks. He indicated that the

---

[2]In his complaint, Arrington alleges that on May 13, 2003, he "began experiencing an insufferable degree of pain and discomfort in the stomach area" which necessitated medical assistance. (Doc. 1, p. 3, ¶ 11). However, in his opposition brief, he represents that his stomach problems began in August 2002. The factual background will therefore encompass Arrington's relevant medical treatment beginning in August 2002.

antacid tablets were ineffective.  An examination revealed no outward signs of difficulty.  He was diagnosed with dyspepsia, or indigestion, and prescribed Tagamet.  He was also directed to elevate the head of his bed, increase his fluids and to minimize food intake prior to bedtime.  (Doc. 25-1, p. 52).

He did not register another complaint related to his stomach until March 3, 2003.  At that time, he complained of gas.  His physical examination was normal, but he was given medication to treat the gas.  (Doc. 25-1, p. 63).

On April 28, 2003, he complained of experiencing nausea and headache for one day.  His temperature and blood pressure were normal.  He was given a prescription for Pepto Bismol tablets.  (Doc. 25-1, p. 62).

On May 14, 2003, he was seen in the medical department by a P.A. for complaints of fever and nausea.  Even though his temperature was 98.1 degrees, he was given a prescription for Tylenol, as needed for fever.  He was also prescribed twelve Pepto Bismol tablets for nausea.  (Doc. 25-1, p. 13, ¶ 62,  p. 65).

He was seen for continuing complaints of stomach problems on May 19, 2003.  At that time, he was diagnosed with dyspepsia, or indigestion, and given a prescription for Tagamet to be taken twice daily for two weeks.  (Doc. 25-1, p. 65).  He was given two refills for the medication and informed that if the medication was not effective in two weeks, a stronger treatment would be prescribed and an X-ray

series might be ordered. A Helicobacter pylori ("H. pylori") test was also ordered.[3] (Id.).

In July 2003, while being seen for complaints unrelated to his stomach, Arrington was advised that he tested positive for H. pylori.[4] He was instructed to increase his fluid intake and was prescribed the standard treatment regimen for H. pylori, which included two antibiotics and an acid blocker. (Doc. 25-1, p. 66; Doc. 25-2, p. 47).

Arrington was out of the facility on a writ to Washington D.C. from July 28, 2003, until October 22, 2003. (Doc. 25-1, p. 15, ¶ 71).

Arrington reported to the medical department on November 10, 2003, with complaints of bloating and gas in his abdomen. (Doc. 25-2, p. 12). He indicated that he ceased taking the prescribed acid blocker. (Doc. 25-1, p. 16, ¶ 73, Doc. 25-2, p. 12). He was diagnosed with gas and given a prescription for Mylanta liquid. He was also instructed to continue the "maintenance dose" of the acid blocker. (Id.)

---

[3]The Center for Disease Control ("CDC") H. pylori fact sheet for Health Care Providers identifies H. pylori as a "spiral-shaped bacterium that is found in the gastric mucous layer or adherent to the epithelial lining of the stomach. H. pylori causes more than 90% of duodenal ulcers and up to 80% of gastric ulcers." (Doc. 25-2, p. 1). The informational sheet further provides that "[p]ersons with active gastric or duodenal ulcers or documented history of ulcers should be tested for H. pylori, and if found to be infected, they should be treated. To date, there has been no conclusive evidence that treatment of H. pylori infection in patients with non-ulcer dyspepsia is warranted." Id. at p. 2.

[4]According to the CDC's H. pylori fact sheet for Health Care Providers, "H. pylori causes chronic active, chronic persistent, and atrophic gastritis in adults and children. Infection with H. pylori also causes duodenal and gastric ulcers." (Doc. 25-2, p. 46).

On December 8, 2003, he came to the medical department seeking X-ray results of his ankle. At that time, he also indicated that he was still suffering from gas, but that the Mylanta was working well. (Doc. 25-2, p. 14).

Refills for Maalox and Mylanta prescriptions were provided to Arrington on January 2, 2004. (Doc. 25-2, p. 15). During two other January visits, complaints of headache, diarrhea, and nausea were treated with prescriptions for Pepto-Bismol, Motrin, and Maalox. (Doc. 25-2, p. 17). In addition, he was given Zantac, a new acid blocker; the original acid blocker was discontinued. (Id.)

In early February, he complained of side effects from the Zantac. At his request, the Zantac was discontinued and he was prescribed the original acid blocker and Pepto-Bismol. (Doc. 25-2, p. 16).

A few days later, he reported to the pulmonary and infectious disease clinic complaining of stomach discomfort and being under stress. Arrington admitted that he was smoking and was not exercising. (Id.) The physician further educated him on the cause of dyspepsia and the role H. pylori plays in ulcers and in acid production and discussed stress avoidance techniques. He was also encouraged to quit smoking. (Id.)

Later that month, he reported to the medical department for sick call complaining of bowel problems and was seen by P.A. Inch. (Doc. 25-2, p. 19). When questioned about his diet, he admitted to eating few fruits and vegetables, and drinking minimal fluids, except for coffee and tea. He also admitted to engaging in

5

minimal exercise.  He was instructed to increase his intake of fruits and vegetables, increase cardiovascular exercise, and to continue his medication.  (Id.)

His bowel discomfort continued throughout March 2004.  (Doc. 25-2, pp. 20-21).  On one occasion he complained to P.A. Inch of abdominal pain.  (Doc. 25-2, p. 18).  No weight loss was noted.  He was counseled on his diet and was referred to the pyschology department to address his stress.  (Doc. 25-2, p. 18).  He was also instructed to return to sick call if the symptoms persisted.  In addition, a colonoscopy was ordered.  (Id.)  Later that month, P.A. Inch treated him for complaints of dizziness and diarrhea.  There were no complaints of abdominal pain, nausea or vomiting.  Nor did he report blood in his stool.  He was instructed to increase his fluid intake and to follow up with his primary care provider.  He was given a day of rest and directed to return to sick call if he developed blood in his stool.  (Doc. 25-2, p. 21).

He was seen on two occasions in April.  On one occasion, P.A. Inch prescribed him an antibiotic for an earache.  On April 27, 2004, he was diagnosed with anemia of unknown origin.  (Doc. 25-2, p. 22).  A colonoscopy was again recommended, as was an esophagogastroduodenoscopy ("EGD").  (Id.)

In May, June and early July 2004, he was seen for a myriad of reasons, including dental issues and medication refills.  (Doc. 25-2, pp. 25-29).

In mid-July, the EGD and colonoscopy were performed.  Mild internal hemorrhoids and mild reflux esophagitis were noted, but no active ulcer disease was found.  (Doc. 25-1, p. 22, ¶ 103).  It was further concluded that his anemia was

"secondary to his chronic hepatitis" as there was "no sufficient gastrointestinal source to explain his anemia." (Id.)  These results were discussed with Arrington on July 26, 2004. (Doc. 25-2, p. 28).

On August 18, 2004, Arrington was seen by the doctor to discuss the status of his hepatitis and the need for treatment.  Arrington stated, as he had in the past, that he was soon leaving on writ for an unknown period of time. (Doc. 25-1, pp. 16, ¶ 72, 19, ¶ 86, 21, ¶ 94).  This made long term management of his Hepatitis-C impossible as it needs to be managed by one primary physician to ensure compliance and consistency of treatment. (Doc. 25-1, pp. 22-23 ¶105, Doc. 25-2, p. 28).

On August 30, 2004, he was seen by P.A. Inch for increased bouts of diarrhea. (Doc. 25-2, p. 30).  He reported taking three doses of his acid blocker per day, rather than the prescribed dosage of one per day.  He was examined and found to be in no apparent distress.  He was educated on the correct dosage and administration of all his medications.  He was also advised to increase his fluid and fiber intake and to return if the problem persisted. (Id.)

On September 7, 2004, when Arrington left on writ, his acid blocker, iron tablets and inhaler prescriptions accompanied the transfer form. (Doc. 25-2, pp. 32-34, 37).  He returned on October 19, 2004, at which time he received refills of the medications prescribed prior to transfer, and was signed up to continue treatment with the infectious disease and pulmonary clinic.

On October 25, 2004, he was seen by the doctor at the clinic. The doctor noted that Arrington believed that he could "get rid of" Hepatitis C without taking interferon. (Doc. 25-2, p. 39). The doctor stressed that there was no esophageal or stomach-related reason for the anemia. (Id.).

He was seen a number of times between October 2004 and January 2005. He did not complain of abdominal pain during any of the visits. (Doc. 25-2, p. 38).

On January 24, 2005, he was diagnosed with advanced Hepatitis-C virus with cirrhosis. (Doc. 25-2, pp. 40-41). His acid blocker and iron pills were discontinued. (Id.)

On February 15, 2005, he was seen on sick call complaining of bloating and upset stomach since stopping the acid blocker. (Doc. 25-2, p. 43). P.A. Inch prescribed a different acid blocker and ordered an abdominal ultrasound. (Doc. 25-2, p. 43).

The instant action was commenced on February 3, 2005, alleging "medical malpractice and deliberate indifference in violation of the Eighth Amendment to the United States Constitution" with regard to his diagnosis and treatment of the H. pylori infection. (Doc. 1, pp. 1, 7). Defendants now move for summary judgment on all claims.

## II.   Standard of Review

"Summary judgment serves as a minimal but important hurdle for litigants to overcome before presenting a claim to a jury." Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 314 (M.D. Pa. 2004). Faced with such a motion, the adverse party

must produce affirmative evidence, beyond the disputed allegations of the pleadings, in support of the claim.  FED. R. CIV. P. 56(e); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Corneal v. Jackson Township, 313 F. Supp. 2d 457, 464 (M.D. Pa. 2003), aff'd, 94 Fed. Appx. 76 (3d Cir. 2004).  "Such affirmative evidence--regardless of whether it is direct or circumstantial--must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance."  Saldana v. Kmart Corp., 260 F.3d 228, 231-32 (3d Cir. 2001)(quoting Williams v. Borough of West Chester, 891 F.2d 458, 460-61 (3d Cir. 1989).  Only if this burden is met can the cause of action proceed. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. V. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see FED. R. CIV. P.  56(c), (e).

**III.    Discussion**

    **A.    Bivens Claim**

        *1.    Sovereign Immunity*

The doctrine of sovereign immunity precludes a plaintiff from bringing a Bivens action against a federal agency, See FDIC v. Meyer, 510 U.S. 471, 484-86 114(1994).  Suits brought against federal officials in their official capacities are to be treated as suits against the employing government agency.  Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) (cited with approval in Christy v. Pa. Turnpike Comm'n, 54 F.3d 1140, 1143 n. 3 (3d Cir.1995)).  As a result, a Bivens suit brought against an individual federal official acting in his official capacity is barred by the doctrine of sovereign immunity, See also Chinchello v. Fenton, 805 F.2d 126, 130 n.

4 (3d Cir.1986) (affirming district court's conclusion that sovereign immunity barred an official-capacity Bivens claim), and the court lacks jurisdiction to hear the claim. See Kabakjian v. United States, 267 F.3d 208, 211 (3d Cir.2001) (holding that district courts lack jurisdiction to hear claims brought against the United States unless Congress has explicitly waived sovereign immunity).

Arrington seeks to impose liability on defendants Inch and Laino in their official capacities as employees of the Federal Bureau of Prison. Plaintiff's Bivens claim against these defendants in their official capacities is barred by the doctrine of sovereign immunity.

   2. *Statutory Immunity*

Defendant Inch claims that as a commissioned officer of the Public Health Service (see Doc. 25, p. 44), she is absolutely immune under the terms of the Public Health Service Act, 42 U.S.C. § 233(a). Section 233(a) makes the Federal Tort Claim Act ("FTCA") the exclusive remedy for an injury relating to Public Health Service officers' performance of medical or related functions within the scope of their duties. Cuoco v. Moritsugu, 222 F.3d 99, 107 (2d Cir. 2000) (concluding that under 42 U.S.C. § 233(a), the FTCA is the exclusive remedy for medical malpractice committed by Public Health Service employees acting within the scope of their office or employment); see also, Anderson v. Bureau of Prisons, No. Civ. 1:CV-04-2666, 2005 WL 2314306, *5 (M.D.Pa. Sept. 22, 2005)(same); Whooten v. Bussanich, No. Civ. 4:CV-04-223, 2005 WL 2130016, at *3 (M.D. Pa. Sept. 2, 2005)(same); Freeman v. Inch, No. 3:04-CV-1546, 2005 WL 1154407, at *2 (M.D. Pa. May 16,

2005)(same). Hence, Arrington's <u>Bivens</u> claim against Inch is subject to dismissal as she is a commissioned officer of the Public Health Service.

        3.     *Qualified Immunity*

The doctrine of qualified immunity provides that government officials performing "discretionary functions," are shielded from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." <u>Wilson v. Layne</u>, 526 U.S. 603, 609 (1999); <u>Saucier v. Katz</u>, 533 U.S. 194, 200-01 (2001).  This doctrine provides not only a defense to liability, but "immunity from suit." <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991); <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985).

To gain the protection of the doctrine, the defendant must show either (1) that the plaintiff has not demonstrated "a deprivation of an actual constitutional right," or (2) that the right at issue was not "clearly established at the time of the alleged violation." <u>Conn v. Gabbert</u>, 526 U.S. 286, 290 (1999); <u>see</u> <u>also</u> <u>Doe v. Groody</u>, 361 F.3d 232, 237 (3d Cir. 2004); <u>accord</u> <u>Wright v. City of Philadelphia</u>, 409 F.3d 595, 600 (3d Cir.2005) (noting that six Courts of Appeals have ruled that first step in qualified immunity analysis is whether a constitutional violation has occurred).  When immunity is raised at the summary judgment stage, the court's analysis of the merits of the claims for purposes of summary judgment essentially merges with its analysis of the existence of a deprivation of federal rights for purposes of immunity. <u>See</u> <u>Gruenke v. Seip</u>, 225 F.3d 290, 299-300 (3d Cir. 2000); <u>Russoli v. Salisbury Township</u>, 126 F. Supp. 2d 821, 838-41 (E.D. Pa. 2000); <u>see also</u>

Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff.)").

Proceeding under the above framework, the court will examine Arrington's Eighth Amendment claim to determine whether Laino is entitled to qualified immunity, and whether summary judgment is warranted.

To demonstrate a prima facie case of Eighth Amendment cruel and unusual punishment based on the denial of medical care, a plaintiff must establish that defendants acted "with deliberate indifference to his or her serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104 (1976); Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993). There are two components to this standard: First, a plaintiff must make an "objective" showing that the deprivation was "sufficiently serious," or that the result of the defendant's denial was sufficiently serious. Additionally, the plaintiff must make a "subjective" showing that defendant acted with "a sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 298 (1991); see also Montgomery v. Pinchak, 294 F.3d 492, 499 (3d Cir.2002).[5]

---

[5] The "deliberate indifference to serious medical needs" standard is obviously met when pain is intentionally inflicted on a prisoner, where the denial of reasonable requests for medical treatment exposes the inmate to undue suffering or the threat of tangible residual injury, or when, despite a clear need for medical care, there is an intentional refusal to provide that care. See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) (quoting White v. Napoleon, 897 F.2d 103, 109 (1990); Monmouth County Correctional Inst. Inmates v. Lensario, 834 F.2d 326, 346 (3d Cir. 1987).

This test "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients. Courts will 'disavow any attempt to second guess the propriety or adequacy of a particular course of treatment . . . which remains a question of sound professional judgment.'" Little v. Lycoming County, 912 F. Supp. 809, 815 (M.D. Pa) aff'd, 103 F.3d 691 (1996) (citing Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754,762 (3d Cir. 1979), quoting Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977)).

When an inmate is provided with medical care and the dispute is over the adequacy of that care, an Eighth Amendment claim does not exist. Nottingham v. Peoria, 709 F. Supp. 542, 547 (M.D.Pa. 1988). Mere disagreement as to the proper medical treatment does not support an Eighth Amendment claim. Monmouth County Correctional Inst. Inmates v. Lensario, 834 F.2d 326, 346 (3d Cir. 1987). Only flagrantly egregious acts or omissions can violate the standard. Medical negligence alone cannot result in an Eighth Amendment violation, nor can any disagreements over the professional judgment of a health care provider. White v. Napoleon, 897 F.2d 103, 108- 10 (1990).

Throughout the relevant time period, Arrington was seen on numerous occasions by various medical personnel. Each and every time he was seen, he was evaluated and was prescribed medication to ease his discomfort. Diagnostic tests were ordered, and performed, to facilitate treatment. Unfortunately, despite all the medical intervention, Arrington still suffers from discomfort. This is clearly a case where Arrington has been given medical attention and is dissatisfied with the

results. An inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. Durmer, 991 F.2d at 69; Spruill, 372 F.3d at 235. Courts will not second guess whether a particular course of treatment is adequate or proper. Parham v. Johnson, 126 F.3d 454, 458 n. 7 (3d Cir. 1997). Under these circumstances and based upon the well-documented course of treatment set forth in the record, Laino was not deliberately indifferent to Arrington's serious medical needs and qualified immunity shields him from suit. Defendants' motion for summary judgment on this issue will be granted.

### B. Federal Tort Claim Act

The Federal Tort Claims Act confers on district courts subject matter jurisdiction over negligence actions against the United States. It provides, in relevant part, that "the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." See 28 U.S.C . § 1346(b)(1).

Liability under the FTCA is controlled by state law. Molzof v. United States, 502 U.S. 301, 305 (1992); Berman v. United States, 205 F. Supp. 2d 362, 364 (M. D. Pa. 2002); 28 U. S. C. § 1346( b). In Pennsylvania, in order to present a prima facie case of medical malpractice, a plaintiff must prove that "1) the medical practitioner

owed a duty to the plaintiff; 2) the practitioner breached that duty; 3) the breach was the proximate cause of, or a substantial factor in, bringing about the harm the plaintiff suffered; and 4) the damages suffered were the direct result of the harm." Carrozza v. Greenbaum, 866 A. 2d 369, 379 ( Pa. Super. 2004). "Medical malpractice is further defined as the 'unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services.'" Grossman v. Barke, 868 A. 2d 561, 566 (Pa. Super. 2005)( citing Toogood v. Owen J. Rogal, D. D. S., P. C., 824 A. 2d 1140, 1145 (Pa. 2003)).

As a general rule, a plaintiff has the burden of presenting expert opinions that the alleged act or omission of the physician or hospital personnel fell below the appropriate standard of care in the community, and that the negligent conduct caused the injuries for which recovery is sought. Grossman, 868 A. 2d at 566-67. The Pennsylvania Supreme Court has indicated that the instances when expert opinions may be unnecessary in a medical malpractice case are rare. Toogood, 824 A.2d at 1149. The only exception to this rule is when a matter "is so simple and [the] lack of skill or want of care is so obvious, as to be within the range of ordinary experience and comprehension of even non-professional persons." Berman v. United States, 205 F. Supp.2d 362, 364 (M.D.Pa. 2002) (citing Brannan v. Lankenau Hospital, 490 PA 588 (1980)).

Defendant concedes that a duty is owed to Arrington, but argues that the duty has not been breached. (Doc. 23, p. 39). Arrington first complained about

stomach problems in August 2002. Over the next seven months, Arrington was treated for stomach related complaints on five occasions. Each visit resulted in prescription medication and, on the fifth visit, an H. pylori test was ordered.[6] When the H. pylori results proved positive, Arrington was placed on the treatment regimen recommended by the CDC. Thereafter, every complaint of discomfort was met with evaluation and examination, medications were consistently prescribed and diagnostic tests were conducted when warranted.

Although a layperson may appreciate the nature of Arrington's condition, the critical issue is the appropriateness of the treatment. There is no evidence that the care Arrington received from the various BOP medical personnel deviated from accepted medical standards, and the record does not reflect that the acts of the medical personnel were so obviously lacking skill as to be within the range of ordinary experience and comprehension of even nonprofessional persons. Thus, Arrington is not relieved of the requirement that he provide expert testimony that defendant's actions deviated from acceptable medical standards.[7] Mitzelfelt v. Karmin, 584 A. 2d 888, 891 (Pa. 1990). Arrington concedes in his opposition brief

---

[6] Significantly, according to the CDC, there has been no conclusive evidence that treatment of H. pylori infection in patients with non-ulcer dyspepsia such as Arrington is warranted. (Doc. 25-2, p. 1).

[7] Defendant argues that in light of the undisputed medical evidence, no expert medical testimony is required. (Doc. 23, p. 40). Given the Pennsylvania Supreme Court's admonition to the contrary, we disagree. See Toogood, 824 A.2d at 1149.

that expert testimony is necessary, but he provides none. (Doc. 28, p. 8).[8] In defending a summary judgment motion, the party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set froth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Arrington has failed to meet his burden and defendant is entitled to an entry of summary judgment of the FTCA claim.

## IV.   Conclusion

Defendants' motion for summary judgment on the Bivens claim will be granted. Likewise, defendant's motion for summary judgment on Arrington's FTCA claim will be granted.

An appropriate order will issue.

　　　　　　　　　　　　　　　　　　  /s/ Christopher C. Conner
　　　　　　　　　　　　　　　　　　CHRISTOPHER C. CONNER
　　　　　　　　　　　　　　　　　　United States District Judge

Dated:       March 30, 2006

---

[8]Notably, at no time, whether *via* a FED. R. CIV. P. 56(f) motion or otherwise, did Arrington indicate that he was unable to respond to defendant's motion for summary judgment.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JEROME ARRINGTON** | : | **CIVIL ACTION NO. 1:05-CV-0245** |
| Plaintiff | : | (Judge Conner) |
| v. | : | |
| **D. INCH, LT., et al.,** | : | |
| Defendants | : | |

## **ORDER**

AND NOW, this 30th day of March, 2006, upon consideration of defendants' motion to dismiss or, in the alternative, for summary judgment (Doc. 17), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. Defendants motion for summary judgment (Doc. 17) is GRANTED.

2. The Clerk of Court is directed to ENTER judgment in favor of the defendants and against the plaintiff.

3. The Clerk of Court is further directed to CLOSE this case.

    /s/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge